Good morning. May it please the court. My name is Caitlin Oldham. I am representing the plaintiff appellant Sherri Sandau in the case that we're talking about today. This appeal really addresses fundamental constitutional rights. The right to security and privacy in one's home and the right to fundamentally be able to shield your own naked body from the public. That's really what the case was about. And that's really what it's about here. At the close of the plaintiff's case, I moved for judgment as a matter of law on behalf of the plaintiff because there was no evidence that was in the case to find for the defendant. On either claim, there are two claims in the case. Claim 1 related to the entry under the emergency exception of the Fourth Amendment, basically an exception for community caretaking purposes. In the city of Portland, there is a city police ordinance that allows emergency entry for protection of somebody if they are deemed to be incompetent and a harm to him or herself or some other person. And I've set out the applicable policy within the briefing and talked about the rationale for why that claim failed as a matter of law, and it never should have gone to the jury. The basic crux is, in this case, there were no -- there was no exigency. Simply too much time had passed. It did go to the jury, didn't it? It did go to the jury. The judge --- Well, now I'm reviewing your motion on the standard that I have to look at the light most favorable to the nonmoving party and that it could permit only one reasonable conclusion and that that conclusion is contrary to the jury's verdict. Would you agree? I would agree that that is the standard, Your Honor. And therefore, I have to answer two questions. Well, one is the question which you're really fighting. Was there probable cause to believe there's an immediate need for assistance for the protection of life or property? That's correct. That's the question you're really after. So you're saying there is no evidence. I'm reading the evidence now, most favorable to the nonmoving party, no evidence that Officer Wood could have thought he was preventing the plaintiff from injury. Yes, that is correct. What about the neighbor's reports to Wood that periodically through the night, your client was engaged in loud and irrational outbursts. His impression of her when he first saw her, what Officer Wood saw and heard when back at the neighbor's house, banging on the window so hard she could have injured or broken the window, what both officers saw and heard while waiting for the counselors. Seems to me that's sufficient evidence. I respectfully disagree based on the case law out of the Ninth Circuit. Well, what about Stewart? Stewart's a Supreme Court case. In that case, the officers responded to calls reporting a disturbance. They observed disorderly conduct. They observed the problem, which was the fight in progress, and they had no problem doing that. Here, they observed the only thing they saw was a mental disturbance, threats, apparent ability to hurt herself. Well, if I look at that Supreme Court case, I don't know how I can say there's not sufficient evidence. The difference between those two cases is the lack of emergency or exigency at the time that the officers made the entry. What do you mean? And what happened — Are you talking about the 20 minutes of silence? Yes. Is that all you're talking about? I'm talking about a period of time between 25 and 45 minutes when the officer took no action to actually intervene. What happened in Stewart, there was a fight that was in progress that the officers witnessed from the window, and they immediately entered to stop the fight due to a fear of injury of that individual. So what you're really saying is the fact that there's quiet should absolutely lead the jury to believe that there was no problem then. I mean, that seems to me to be an argument about the effect of the evidence. All I'm doing is I'm trying to give every intention of fact to those who are the non-moving party now. And I can't see that quietness necessarily leads one to necessarily believe the thing is over. In fact, it might mean she's hurt herself. It might mean that she's done a lot of other things that we knew, pounding on the window with her head and going through all that. I don't know. And so I'm just saying the standard of review is pretty tough for you to make that decision on imminent need. I would agree that the standard of review is tough. That's also why there are certain evidentiary challenges, including challenges to the expert witness testimony, which in this case was the only testimony that defendants brought in concerning this silence issue. And how that in and of itself could create an exigency. The officers did not talk about that. They talked about the kind of intermittent banging. They didn't talk about why the silence all of a sudden for a period of time created some kind of an emergency. The only testimony in the record relates to that expert witness's testimony. Let me ask you to move on to, away from the entry and the arrest, into the actual manner of the arrest. I think you started off by saying the issue is whether she has the right to cover her naked body from exposure to the public. My understanding is she was not naked and was not exposed to the public. What was she wearing? She was wearing a T-shirt. There is a veil. And a shirt under the shirt? She had a shorter undershirt underneath the T-shirt. Okay. The T-shirt ranged from hitting at the hip to the mid-upper thigh. No underwear, no pants, no socks, and no shoes. Okay. And there's no dispute about the rest of what she was wearing. And so they, if you buy, you know, if you buy the premise that there is an emergency and they have to hustle her out, they take her as she was and put her in the car. Was she otherwise exposed to the public? Yes. Which public? She's taken to the jail, and during her direct testimony, which is part of the arrest. Okay. So she was exposed to the police officers and the jailers? Yes. Any other public? As far as I know, no. Okay. But in the Franklin versus Foxworth case, the individual in that case was exposed also only to officers. Just the fact that she was exposed to the public. She wasn't paraded down in the public streets or anything like that. No. Okay. Now, when she got to the jail, they gave her clothes right away. Is that right? That is not correct. They didn't give her clothes? They did give her clothes, but not right away. How long was it? What happened, she's taken to the police station. She's removed from the police vehicle by two to three additional police officers besides Mr. Woods. So there's three to four officers who are all male, who are now taking her out of the vehicle. Then she's walked into the jail. And she still has her shirt on that comes to the thigh length shirt? Part of the problem is that there's test — there was testimony in the case, including from Officer Wood, that if she moved, if she was moved or she sat down, the shirt moves. Okay. It lifts up. It does expose her private parts of her body. Okay. So as they bring her into the jail, how does she get jail clothes? She is then taken to a booking area where she's again checked in by some officer, not Wood. Wood is in the vicinity, but he is not the person who's checking her into the jail and booking her. And there are other officers that are in that same room, passing around, walking behind her, walking in front of her to the side. And an officer who is right behind her, who lifts the shirt and says, oh, no pants. You know. Do they get her some? She has nothing on underneath. So they get her some. And then eventually they take her to a cell and they give her — or I'm sorry. In the video, it shows them putting pants on her. So how much — so back to my question, how much time transpired? I think it's somewhere between — from the time she gets to the jail. So from the time that she arrives in the vehicle at the jail to the time that she's booked, there isn't video of her when she's — you know, when she's arriving at the jail. So I'm going to have to estimate. Are you talking hours or minutes or what? We're talking probably somewhere in the neighborhood of 15 minutes to 20 minutes or longer that she's without any — Here's the problem I have. Let's assume for the sake of discussion, I know you don't buy this, but let's just assume there's an emergency and they feel they have to arrest her. And pull her out of the house, put her in a car, take her to jail. They don't have time to get her dressed or anything else. But she's not completely naked. She's wearing a nightshirt, essentially. I'm having a hard time finding a problem of taking her to the jail, booking her, and then giving her clothes within 15 minutes of when she arrives, given that she's got this other, you know, nightgown-type shirt on or long shirt on. Well, in Franklin v. Foxworth, the Court found that just, you know, having a shirt and being exposed even inside your own home is an undue intrusion. As I recall, that guy was in fact naked, not covered, wasn't he? No. If you read the case, if you read the facts carefully in the case, there was some testimony by one individual in the case who said that he was naked. The other individuals all testified that he was wearing a shirt, but did not have pants or underwear on. And that's, I mean the state of the art. Well, either way, his genitalia was exposed. And in this case as well, there's a report by the Project Respond folks and testimony during the trial from Wood and from Patricia Lund that they were where they saw that she had no pants or underwear. The only way you can tell that someone's not wearing underwear is if you see their genitals or their buttocks. I mean, there is no other way that I can think of. And so in this case, she also was exposed in the same way that the plaintiff in the Franklin v. Foxworth case was. In that case, was there an emergency to arrest that guy?  That case was the one that was the most important. Okay. Now, in our case, if you abide the premise that there's an emergency, it's distinguishable on that basis, isn't it? I don't think so, because, again, there's a — there's — during trial, the testimony was that there was no emergency. Okay. But that's a contested fact. That's — that's your version. The — well, the only emergency that the — that anybody testifies to relates to the entry. And there is no testimony at all discussing why there was some immediate need to get her to jail, why there was an immediate need to get her out of the home. Well, just a minute. There's nothing that explains that. Just a second. As I understood it, she took a swing at the officer. She was agitated and uncooperative. She wanted to go back in her house, but she'd already lied about making the noise. So the officer was thinking, why should I let her go back in there? This is just another lie. They only went back to the house to lock it up because she wouldn't give them a key. So I'm having a tough time with your idea that there's no evidence that the reason they did what they did was bad. I mean, if she took a swing at them, she was agitated and uncooperative, she now says she wants to go back in the house, but they knew she'd already lied about whether she made the noise anyway. And she wouldn't give them a key. I guess I'm having a tough time with that argument, especially on the standard of review we have again here, which is I'm supposed to see this evidence in the light most favorable to the opposition. Again, in this particular case, the posture is they don't they do not arrest her for assaulting an officer. They don't cite her for any kind of resisting arrest. They give her a traffic ticket, essentially. She's given a cite-in-lieu citation, which they could have just handed to her and let her go back into her home. So there is no, you know, functional emergency of any kind. She weighs 105 pounds, she's 5'1", and she's handcuffed. She asks for clothing. She asks for clothing at least twice or three times, depending on what witness you believe. And she asks for that at all times while she's secured. So there is no ---- Kennedy, isn't that all the good evidence that you presented to the jury? That is ---- The good jury said, no, we don't agree. Part of the concern that I raised in the briefing has to do with the jury instructions relating to that particular claim. There were also some concerns about some evidence that was excluded from trial and the evidence that came in concerning the expert witness. I mean, it's ---- I see that you're down to about nine seconds left. Thank you, Ms. Oldham. Mr. Auerbach. Good morning. Thank you, and may it please the Court. My name is Harry Auerbach, and I represent the defendants and appellees in the case. I thought at the beginning I would just mention, because you were talking about the Foxworth case, what I perceive to be the principal difference between that case and this case, and that is that that was a summary judgment case. And so in that case, this Court was required to view the evidence in the light most favorable to Mr. Curry. And in doing so, they found that there was evidence that he, who was not a suspect or otherwise subject to law enforcement activity, but just happened to live in the house that was the subject of the search warrant, that the Court found there was evidence to support his claim that he was forced to sit on this couch in his home in a state of undress with his genitals exposed to the officers who were performing the search and anybody else who happened by for a couple of hours. So that's the principal difference. In this case, this is a jury case. This case went to the jury, and the question is whether there was sufficient evidence to allow the jury to determine that the way that the manner in which the officers acted in this case was constitutionally reasonable. And it was. And I want to be clear about that. With respect to her state of undress, both the officers — and remember, for purposes of Fourth Amendment, the question is, what did the officers know? What would a reasonable officer, knowing what they knew, do? And both of these officers said, I did not know that she did not have underwear on until she was in the police car. I did not see her buttocks. I did not see her private parts. Both officers testified to that. Didn't she say she asked him if she could put clothes on?  They admit that, that she's been — Well, that's how they — that's how they would know. Well, but she — If she says, can I go back and get underwear, then, you know, they'll put two and two together that maybe she doesn't have underwear on. I don't — I don't know that — I don't know that she specifically said underwear. There's nothing in asking for more clothes that necessarily conveys the information that she's not wearing any. And I believe — and I go back and look at the record, because if I'm wrong about this, I don't want to mislead the Court. But I believe that she did that when she was in the police car. I may be wrong about that, but I think that's right. And — and, again, so — so the — the question is what the jury could — could logically infer from that — that testimony. The — the project respond counselor who testified at trial testified that she couldn't remember whether or not she saw anything, and that — but what she did testify to, without objection, was that she didn't see anything inappropriate in the way that the police officers treated Ms. Sandow. So I think — I think that, given the standard of review, you have to affirm on that ground, because the jury could determine under all the facts and circumstances that the officers' treatment of Ms. Sandow was constitutionally reasonable. And because — so let me talk a little bit about — about this exigency thing. And part of it comes from Ms. Sandow's own testimony. Clearly, this is a woman who has some cognition difficulties, if you read her testimony. But — but based on what her — her own testimony, she had a preexisting brain injury that sometimes caused her what she describes as her little neurons to go flying around and cause her some confusion. She testified that on the day of this incident, she'd been painting her house, and she fell down, and a ladder fell on her, and — and gave her greater brain injury, some kind of concussion. She testified — if you look at how she testifies about what happened to her during the night, it — it paints a picture from which the jury can infer that she was in and out of consciousness and not completely to get her housemate's attention by banging on the windows. If you put that together with all the other evidence in the case, it clearly paints a picture that allows the jury to infer that even though there may have been times when she wasn't acting out, there may have been times when she was quiet, that didn't mean that her emergency had abated, because she could have been unconscious. She — you know, she could have, as — as I think Judge Smith suggested, done other things to hurt herself. And so that, again, goes to the reasonableness of the officer's belief, and that — that's clearly a jury question. I can answer questions about the other issues raised, but if the Court doesn't have any questions for me, I'm content to rest my case. Kennedy. I don't think so, Mr. Horwath. No. Okay. Thank you, sir. Ms. Oldham, you had only a few seconds left, but if you'd like to use them. The big issue is, in the Foxworth case, it was not a summary judgment case. It was a trial that was tried to a judge. In this district, the judge found for the defendants, and the Ninth Circuit reversed. If you review the case, you'll see there was testimony given, and that is my understanding of the posture in that case. Additionally, I just want to iterate that the jury instruction that I had mentioned earlier was in error. I think it was actually a misstatement of the law because it did not provide any definition or help regarding what factors or what to look at to determine how a seizure is going to be unreasonable. Is it unreasonable or not? There is no direction from the judge in any of the instructions that indicates what the jury is supposed to do or look at or how they're supposed to make that determination at all. And that was the concern and why in the model instructions for the Ninth Circuit, as well as the instruction that I had proposed on behalf of Ms. Sandow, we included factors that needed to be looked at to determine reasonableness, and that was in error. Thank you, Ms. Oldham. Mr. Arbeck, thank you. The case just argued is submitted. We'll stand at recess. Thank you.
judges: Silverman, Clifton, Smith